**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| UNITED STATES | ) | | |
| | ) | | Case No. 03-cr-90-12 |
| v. | ) | | |
| | ) | | Hon. Steven C. Seeger |
| LIONEL LECHUGA | ) | | |
| _____ | ) | | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Defendant Lionel Lechuga was a member of the Insane Deuces, a violent gang that plagued the streets of a Chicago suburb. After an eight-week trial in 2008, the Court sentenced him to 20 years of imprisonment.

Lechuga now seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), in light of the COVID-19 pandemic. He points to his health, his weight, his age, the length of time served, and other considerations. The government opposes the motion based largely on his history and the seriousness of his crimes.

For the following reasons, Lechuga's motion is denied.

**Background**

Lechuga was convicted of racketeering conspiracy and narcotics conspiracy for his involvement with the Insane Deuces street gang. *See* 12/10/08 Order (Dckt. No. 1182). The Seventh Circuit provided general background about the gang's activities in *United States v. Morales*, 655 F.3d 608 (7th Cir. 2011), when it affirmed Lechuga's conviction and his 20-year sentence.

Suffice it to say that the Insane Deuces inflicted mayhem on the streets of suburbia. They peddled drugs, brandished guns, and attacked rivals. The Insane Deuces were "bitter rivals" with the Latin Kings, and the rivalry led to a wave of violence. *Id.* at 616. "[A]ll members were

expected to comply with a standing order to attack Latin Kings whenever the opportunity arose."
*Id.* at 617; *see also* Corrected Presentence Investigation Report, at 8–9 (Dckt. No. 1805) ("The Insane Deuces had a general standing order that required its members to kill or otherwise inflict physical harm upon rival gang members, in particular, members of the Latin Kings street gang.").

Innocent people were caught in the crossfire. "The rivalry resulted in frequent and escalating violence, often leading to attacks against victims mistaken for rival gang members." *See Morales*, 655 F.3d at 616.

In 2002, another member of the gang (Orlando Rivera, a "Junior Enforcer") was arrested and began cooperating with the government. *Id.* at 617. He provided substantial intelligence about the wave of criminality inflicted by the Insane Deuces. *Id.* "The intelligence gathered through Rivera produced evidence on four murders, eleven attempted murders, two solicitations to commit murder, other shootings, and narcotics distribution – all of which the Deuces perpetrated in 2002 alone." *Id.*

One of the murder victims was 14 years old. *See* Corrected Presentence Investigation Report, at 9 (Dckt. No. 1805); *see also* Government's Version of the Offense, at 64 (Dckt. No. 1805) (showing a picture of the victim). Another was only 18. *See* Corrected Presentence Investigation Report, at 9.

Lechuga was an "older Deuce who had been rolled back to Junior status." *See Morales*, 655 F.3d at 618. The gang had at least three tiers: Seniors, Juniors, and Shorties. *Id.* at 616. But the "local chapter in Aurora was organized at the Junior level, likely due do the ongoing incarceration of the local Seniors." *Id.*

Juniors were responsible for the day-to-day operations of the gang. "They directed the Shorties' activities and planned narrow-scale operations, determining which Shorties would participate, assigning responsibilities and distributing firearms to them, and supervising their activities." *Id.* By directing the Shorties, the Juniors oversaw the criminal conduct. Shorties "bore responsibility for executing most of the gang's activities, including carrying out violent acts and selling narcotics to fund the gang." *Id.*

The Seventh Circuit acknowledged that the "record shows conflicting accounts of [Lechuga's] previous status." *Id.* at 618. At trial, the government presented evidence that Lechuga "was a Senior Deuce prior to the rollback." *Id.* Lechuga asserted that "he was retired and that he was pulled back in when Deuce leadership raised the retirement age to 35." *Id.*

The Seventh Circuit made a point of noting the lack of evidence that Lechuga had announced his retirement at any point. "In his brief, Lechuga makes multiple references to having retired in 1996. . . . He even alleges that he 'formally declared his retirement from the gang in 1996.' . . . . But he does so without any citation to the record, and we find no evidence that he ever announced or declared his intentions to anyone." *Id.* at 641 n.11.

Lechuga's defense that he had withdrawn from the gang was "quite uncertain." *Id.* at 627. "[H]is recorded statements, far from showing an affirmative act to withdraw, indicated that he was willing to participate in the Deuces' activities during his purported withdrawal." *Id.* The evidence at trial included the following recorded statement by Lechuga: "'I've told some of you in the room before that, hey, if there's somethin' I can do . . . I'll help you out.'" *Id.* (ellipsis in original).

Putting aside his exact status between 1996 and 2002, Lechuga "did resume active participation in the gang's affairs" in 2002. *Id.* at 618. He promoted warfare with rivals. "He

counseled Deuce leaders on how best to carry out inter-gang warfare within the Folks network without risking their ability to protect their members in prison." *Id.* He facilitated the sharing of gang proceeds, and he promoted the drug trade, too. "He also advocated changes in the caja system [(a form of communal property for gang members)] to increase efficiency in fronting drugs to gang members, perhaps as a result of his being unable to obtain from an enforcer the cocaine he'd requested for resale in July 2002." *Id.*; *see generally* Corrected Presentence Investigation Report, at 10 (Dckt. No. 1805).

The government concedes that "there was no evidence showing that defendant personally participated in any of the murders committed by members of the conspiracy." *See* Gov't Resp., at 12 (Dckt. No. 1987). But Lechuga's participation in the gang was enough to render him responsible for the actions of his co-conspirators. *See Morales*, 655 F.3d at 627–28 (expressing skepticism of Lechuga's withdrawal defense and noting that "Lechuga cannot show prejudice requiring severance as a result of the evidence of his co-conspirators' violence"). So, even though his personal involvement declined by the time of the investigation, Lechuga shared responsibility for the criminality of his Insane Deuces co-conspirators.

The jury found Lechuga guilty of racketeering conspiracy (18 U.S.C. § 1962(d)) and conspiracy to possess/distribute controlled substances (21 U.S.C. § 846). He had a total offense level of 43, and a criminal history category of VI. *See* Sentencing Recommendation (Dckt. No. 1804). The recommended sentence under the Guidelines was 50 years (*i.e.,* 20 years for racketeering conspiracy, and 30 years for conspiracy to possess/distribute controlled substances). *See* Corrected Presentence Investigation Report, at 31, 35 (Dckt. No. 1805).

Judge Leinenweber ultimately sentenced him to 240 months' imprisonment on the racketeering and narcotics counts, with the sentences to run concurrently. *See* Judgment (Dckt.

No. 1679).  Twenty years was the mandatory minimum for the drug conspiracy count.  *See* Mtn.,
at 7 (Dckt. No. 1980).  So Lechuga received the lowest possible sentence, based on the finding of
guilt by the jury.

At sentencing, the Court acknowledged that Lechuga was less involved in the key
incidents than some of the other gang members.  *See* 9/3/09 Tr., at 94:21-25 (Dckt. No. 1775)
("Again, when reviewing all of the tapes and testimony, while many people were involved to a
great extent on tape and on pictures and so forth, there was considerably your absence [sic] for
many of them, and I believe that certainly distinguishes you from many of the other defendants
in this case.").  After hearing the full record during an eight-week trial, Judge Leinenweber
decided that 20 years was an "appropriate" sentence, without expressing any reservations that a
20-year sentence (again, the mandatory minimum) was too harsh.  *Id.* at 95:19-20.  The Court
weighed the § 3553(a) factors, taking into account the "nature and circumstances and history and
characteristics of yourself, the seriousness of the offense, [and] adequate deterrence," including
both specific and general deterrence.  *Id.* at 95:12-16.

Twenty years is a long time to be in federal prison.  Even so, the 20-year sentence took
into account that Lechuga played a lesser role than his fellow gang members.  Defendants
Morales, Hernandez, and Rodriguez received life sentences.  *See Morales*, 655 F.3d at 620.
Defendant Barbosa received a 40-year sentence.  *Id.*  So four of his fellow defendants received
substantially more time.

Lechuga and another defendant (Handley) received 20-year sentences.  *Id.*  Only one
defendant received less time (Crowder was sentenced to 177 months), but only nominally.
Crowder received a sentence of 14 years, nine months because he was already incarcerated for
five years and three months on state charges of aggravated discharge of a firearm.  *Id.*; *United*

*States v. Crowder*, 2021 WL 698498, at *1 (N.D. Ill. 2021). Taking into account his incarceration for state charges, Crowder received a 20-year sentence, too. *Id.*

The sentencing took place more than a decade ago. Lechuga is now 51 years old, having served more than 15 years of his 20-year sentence. *See* Gov't Resp., at 3, 9 (Dckt. No. 1987). He is incarcerated at FCI Oxford in Wisconsin and is projected to be released in October 2022. *Id*. at 3.

He recently petitioned this Court to recommend to the Bureau of Prisons that he be allowed to serve the final year of his sentence at a halfway house. *See* Petition for Judicial Recommendation (Dckt. No. 2014). The Court agreed, largely because of the length of his sentence, the minimal disciplinary history in prison, and the prospects for Lechuga long-term. *See* 5/3/21 Order (Dckt. No. 2017). A halfway house would improve the chances of a better future for Lechuga.

## Analysis

In 2018, Congress passed the First Step Act, which expanded the power of district courts to reduce a defendant's sentence under 18 U.S.C. § 3582(c)(1)(A). Before, only the Bureau of Prisons could petition a district court to reduce a defendant's sentence. *See United States v. Sanford*, 986 F.3d 779, 781 (7th Cir. 2021). Today, inmates can file petitions for a reduction of their sentences, too. *Id*. The statute contains a procedural hurdle (*i.e.,* exhaustion of administrative remedies) and a substantive hurdle (*i.e.,* a finding of extraordinary and compelling reasons for early release).

To clear the procedural hurdle, a defendant must show that he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons on the defendant's behalf," or that 30 days have passed "from the receipt of such a request by the warden of the defendant's

facility, whichever is earlier." *See* 18 U.S.C. § 3582(c)(1)(A). The government concedes, and the Court agrees, that Lechuga satisfied the exhaustion requirement. *See* Gov't Resp., at 7–8 (Dckt. No. 1987) (acknowledging that Lechuga submitted an administrative request to the warden of FCI Oxford, and that "[b]ecause more than 30 days have elapsed since defendant's request was received by the warden, defendant has exhausted his administrative remedies as required by § 3582(c)(1)"). Lechuga cleared the procedural hurdle, so the only remaining hurdle is substantive.

A district court may reduce a sentence, after considering the factors set forth in § 3553(a), "if it finds" that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[1] *See* 18 U.S.C. § 3582(c)(1)(A). The burden rests on the defendant seeking compassionate release. *See United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021).

---

[1] There appears to be somewhat of a divide about how, exactly, the order of operations should flow when evaluating a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). A district court may order early release if it "finds" that "extraordinary and compelling reasons warrant" a reduction "after considering" the factors in section 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A)(i). The statutory text looks for a finding of X "after" considering Y. *See* 18 U.S.C. § 3582(c)(1)(A). A couple recent Seventh Circuit cases seem to suggest that the section 3553(a) factors permeate a court's consideration of the other statutory criteria, including whether there are "extraordinary and compelling reasons" for release. *See, e.g., United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021) ("[A] court may release a prisoner for compassionate reasons only if, '*after* considering the factors set forth in section 3553(a),' it finds extraordinary and compelling reasons.") (emphasis added); *see also United States v. Lee*, 2021 WL 2377225, at *2 (7th Cir. June 10, 2021) (same). A different Seventh Circuit case seems to separate the step of finding "extraordinary and compelling reasons" from the step of considering the section 3553(a) factors. *See United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021) ("Once an inmate fulfills the exhaustion requirements, a federal court may grant a prisoner's motion for compassionate release if 'extraordinary and compelling reasons' warrant release and if the request is consistent with the sentencing considerations reflected in 18 U.S.C. § 3553(a)."). At least one other Circuit has described a process in which a finding of "extraordinary and compelling reasons" comes first, and a consideration of the section 3553(a) factors enters the picture only when determining whether a district court should exercise its discretion to order release. *See United States v. Jones*, 980 F.3d 1098, 1106 (6th Cir. 2020) ("But due to § 3582(c)(1)(A)'s confusing phrasing and oddly placed commas, the sequence in which courts must fulfill these statutory requirements and the relationship between the three clauses are not readily apparent. In *Ruffin*, we determined that district courts must engage in these three inquiries in the sequence listed above, i.e., a district court must make the two requisite 'find[ings]' before weighing the applicable

The text of the statute vests district courts with substantial discretion. A district court "may" – not "must" – reduce a sentence "if" it finds that extraordinary and compelling reasons "warrant" a reduction. *See* 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Haynes*, 843 Fed. Appx. 805, 806 (Mem.) (7th Cir. 2021) (noting that a district court's discretion when it comes to compassionate release is "considerable"); *United States v. Lee*, 2021 WL 2377225, at *2 (7th Cir. June 10, 2021) ("broad discretion"). So a court can reduce a sentence only if it makes a "find[ing]" that there are extraordinary and compelling reasons for early release. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Even if such reasons exist, a district court has discretion to deny the request if the reasons do not "warrant" early release. *Id.* The statute governs what a court "may" do, not "must" do. *Id.*

The statutory requirement about "applicable policy statements" falls by the wayside when the inmate (instead of the Bureau of Prisons) moves for compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). The Seventh Circuit has explained that the most recent Guidelines Manual issued by the Sentencing Commission applies only to cases brought "[u]pon motion of the Director of the Bureau of Prisons." *See United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir.

---

§ 3553(a) factors. Supreme Court precedent confirms that the order of analysis that we identified in *Ruffin* is correct.") (citations omitted). The Court flags this open interpretive question, but the order of operations makes little practical difference here – whenever the section 3553(a) factors enter the picture, the Court finds that they weigh against Lechuga's release. By way of illustration only, imagine if an inmate had an extraordinary and compelling health reason for early release (say, being terminally ill, with little time left), but committed a particularly heinous crime. And imagine if a district court determines that the section 3553(a) factors weigh against a reduced sentence. Which part of the text would do the work and carry the load when the court later denies the motion? If a court concludes that the section 3553(a) factors defeat the motion, would that mean that there are no "extraordinary and compelling reasons" for early release (*i.e.*, after considering the section 3553(a) factors, the "reasons" for release are not extraordinary and compelling)? Or, would it mean that the inmate's extraordinary and compelling reasons do not "warrant" a reduced sentence? Or, would it mean that the inmate's extraordinary and compelling reasons may warrant a reduced sentence, but the court declines to exercise its discretion to order it (as empowered by the word "may") after considering the section 3553(a) factors? Or something else? Again, these questions are merely academic in this particular case. This Court would land in the same place.

2020) (citing U.S.S.G. § 1B1.13). There are no "applicable" policy statements when the prisoner files a motion for compassionate release, so there is nothing to be "consistent" *with*. *Id.* at 1180–81 ("[T]he Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release. District judges must operate under the statutory criteria – 'extraordinary and compelling reasons' – subject to deferential appellate review."). Even so, a district court can take into account the Sentencing Commission's "working definition of 'extraordinary and compelling reasons'" when exercising its discretion. *Id.* at 1180.

Right off the bat, the government concedes that "defendant has established an 'extraordinary and compelling' reason for a sentence reduction." *See* Gov't Resp., at 10 (Dckt. No. 1987). The government acknowledges that Lechuga is obese because he has a BMI of just over 30. *Id.* at 10. It also recognizes that he has a "substantially diminishe[d] ability to provide self-care against serious injury or death as a result of COVID-19 within the environment of a correctional facility." *Id.*

But the government also argues that "this showing does not in itself entitle defendant to relief under 18 U.S.C. § 3582(c)(1)." *Id.* at 11. The United States skips straight to a consideration of the section 3553(a) factors, arguing that they do not weigh in favor of early release. *See United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021) ("Because of the importance of the § 3553(a) factors, courts are not compelled to release every prisoner with extraordinary and compelling health concerns."); *Haynes*, 843 Fed. Appx. at 805–06.

The Seventh Circuit has instructed that, when an inmate "presents individualized arguments along with a meaningfully detailed record, the district court's opinion must leave us assured that it considered those individualized arguments and properly exercised its discretion." *See Newton*, 996 F.3d at 491; *see also United States v. Joiner*, 988 F.3d 993, 995 (7th Cir. 2021)

(explaining that district courts must address a movant's "principal arguments," meaning arguments that are "individualized to the facts of the movant's case") (internal citation and quotation marks omitted). A district court "need not provide a detailed, written explanation analyzing every § 3553(a) factor," but must provide "some statement of reasons supporting its decision." *See United States v. Sanders*, 992 F.3d 583, 588 (7th Cir. 2021) (citation omitted); *see also Lee*, 2021 WL 2377225, at *2.

Here, the Court considers the entire record, including all of the material in Lechuga's motion and supporting materials, as well as information on the docket about the underlying evidence, trial, sentence, and appeal.[2] All in all, considering the appropriate factors in conjunction with the health risks that Lechuga faces due to COVID-19 and his prospects upon release, the Court concludes that the facts do not support a reduced sentence.

## A.      Factors in Favor of Compassionate Release

Lechuga argues for early release primarily on the basis of his health, including his medical conditions and his age. The government conceded that Lechuga's health situation presented an extraordinary and compelling reason for early release.

This Court is not bound by that concession. The statute entrusts the responsibility to "find[]" whether there are reasons for compassionate release to the district court. *See* 18 U.S.C. § 3582(c)(1)(A) (providing that "the court" "may" reduce a sentence "if *it* finds") (emphasis added); *see also United States v. Black*, 2021 WL 2283876, at *3 (7th Cir. 2021) ("The district court was not bound by the parties' agreement that Black had shown extraordinary and compelling reasons . . . ."); *United States v. Shepard*, 2021 WL 848720, at *6 (D.D.C. 2021)

---

[2] The Corrected Presentence Investigation Report (Dckt. No. 1805) and the accompanying Government's Version of the Offense (same) are listed on the docket, but were not available via ECF. So the Court pulled the hard copies from the Clerk's Office.

("The question, then, is whether Shepard has demonstrated extraordinary and compelling reasons

supporting his release based on his advanced age, as Shepard and the government agree he has.

As an initial matter, the Court concludes that it is not bound by the government's concession.

Compassionate release is a discretionary power, and the Court will not grant release unless it

independently finds that the statutory standard is satisfied."); *United States v. Spack*, 2021 WL

1239611, at *4 (D. Minn. 2021) (concluding that "Spack's risk factors of obesity and smoking

are not sufficiently severe to constitute extraordinary and compelling reasons for a sentence

reduction," even though the "Government agrees that Spack is a former smoker and that he has

presented extraordinary and compelling circumstances based on that status").

The Court finds that his medical situation is not so extraordinary, and is not so

compelling. After carefully reviewing the record, the Court concludes that Lechuga's medical

conditions do not rise to the level of a serious physical or medical condition.[3]

Lechuga is a borderline obese, middle-aged man with some modest health challenges,

which appear well under control. His overall health situation tilts in favor of early release, but

not by much. He is not that heavy, not that old, and not that unhealthy.

Lechuga is a 51-year-old man with a BMI of 30.2 (at the lowest end of the "obese"

range). *See* Gov't Resp., at 9–10 (Dckt. No. 1987). There is a relationship between weight and

---

[3] The policy statement from the Sentencing Commission includes a list of instances when "extraordinary and compelling reasons exist." *See* U.S.S.G. § 1B1.13. One of them is when the inmate is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* at cmt. 1. The Court takes that standard into account when exercising its discretion, but recognizes that it is not conclusive. *See Gunn*, 980 F.3d at 1180. The Court concludes that Lechuga's medical conditions are not particularly "serious" (especially in light of the effective medical treatment that he is currently receiving), and do not "substantially" diminish his ability to provide self-care. *See* U.S.S.G. § 1B1.13. Even if, for the sake of argument, the Court were to conclude that his health conditions constituted an "extraordinary and compelling" reason for release, the Court would nonetheless deny the motion in the exercise of its discretion after considering the section 3553(a) factors (for the reasons explained below).

the risk from the virus. The CDC has said that having a BMI between 30 and 40 increases the risk of severe illness from COVID-19. *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited June 11, 2021).

Lechuga's BMI of 30.2 (based on his height, 5'4", and weight, 176 pounds) puts him at the very low end of that range. He is over the obesity line, but just barely. If he lost two pounds, his BMI would fall to 29.9, and thus be in the overweight (but not obese) range. *See Calculate Your Body Mass Index*, National Institute of Health, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited June 11, 2021).

Putting that number in perspective, Lechuga would need to gain more than 50 pounds (and reach a total weight of 233 pounds) to hit a BMI of 40. So, he might be technically obese, but the gravity of the situation seems less than in other cases.

Obesity does play a role when it comes to health risks. But not all weights are created equal. Presumably a BMI of 40 places a person at greater risk than a BMI of 30, just like a BMI of 30 (obese) might create a marginally greater risk than a BMI of 29 (not obese). *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited June 11, 2021) ("The risk of severe COVID-19 illness increases sharply with elevated BMI."). More weight carries more risk, and less weight carries less risk. And here, Lechuga is obese by two pounds.

Modest obesity adds something to the mix, but not a lot, especially when other factors pull in the other direction. "[S]everal courts have denied compassionate release motions filed by relatively young defendants like Villasenor with one or two COVID-19 risk factors, particularly

12

in cases involving a border line obesity diagnosis." *See United States v. Villasenor*, 2020 WL 7129368, at *6 (N.D. Ill. 2020); *see also United States v. Walker*, 2020 WL 6363841, at *2–3 (C.D. Ill. 2020) (denying compassionate release to defendant housed at FCI Oxford who had been diagnosed with obesity); *United States v. Capo*, 2020 WL 5994500, at *2–3 (N.D. Ill. 2020) (denying motion for compassionate release after balancing the section 3553(a) factors in light of the defendant's obesity); *United States v. Rogers*, 2020 WL 4816053, at *2–3 (N.D. Ill. 2020) (denying motion for compassionate release because of the section 3553(a) factors after explaining that obesity "is considered a risk factor by the CDC" and accepting the government's concession that there was an "extraordinary and compelling reason" for release on that basis); *United States v. Fakhouri*, 2020 WL 7698371, at *3–4 (N.D. Ill. 2020) (assuming without deciding that obesity as established by a BMI of 30.4 "demonstrates that there is an extraordinary and compelling reason supporting" compassionate release, but nevertheless denying release in light of the section 3553(a) factors).

Overall, the Court takes Lechuga's modest obesity into account, and agrees that it provides mild support for early release. It just doesn't move the needle very far.

Lechuga also suffers from hypertension. *See* BOP Medical Records (Dckt. No. 1982-1). According to the CDC, heart conditions matter when it comes to COVID-19. But the CDC hedged when it came to high blood pressure, saying that it "possibly" can increase the risks from the coronavirus. *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited June 11, 2021) ("Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and *possibly* high blood pressure

(hypertension) **can make you more likely** to get severely ill from COVID-19.") (bold in original; italics added).

But again, Lechuga's situation is not particularly serious. According to his doctor, as revealed in his medical records, his hypertension is "well controlled" by medication. *See* BOP Medical Records (Dckt. No. 1982-1, at 8 of 12); *see also id.* at 9 of 12 ("Inmate is currently enrolled in a hypertension chronic care clinic."). He takes one pill a day. *Id.* at 7–8. He has no bleeding, clotting, chest pain, shortness of breath, swelling, or new cough. *Id.* at 8. "Pain: Not Applicable." *Id.*

At his most recent exam, his blood pressure was 121/74. *Id.* That's just about normal. According to the American Heart Association, blood pressure is "NORMAL" when the systolic is less than 120 and the diastolic is less than 80. *See Understanding Blood Pressure Readings*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings (last visited June 11, 2021). Blood pressure is "ELEVATED" when the systolic is between 120–129 and the diastolic is less than 80. *Id.* The American Heart Association chart states that "HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 1" exists when the systolic is between 130–139 and the diastolic is between 80–89.

So, a blood pressure reading of 119/79 would be in the "normal" range, *id.*, and Lechuga's most recent reading was 121/74, which is barely across the "elevated" line. There is nothing in the record suggesting that there are any problems managing Lechuga's high blood pressure, which (with the help of medication) is not so high.

Lechuga's motion states that he has a "worrisome family history of heart problems." *See* Mtn., at 2 (Dckt. No. 1980). Lechuga had an elevated level of homocysteine, an amino acid in the blood, which "has been associated with an increased risk of cardiovascular disease,

cerebrovascular disease, peripheral arterial disease and thrombosis." *See* BOP Medical Records (Dckt. No. 1982-1, at 11–12 of 12). His test results showed a score of 18.1 nmol/mL, with a "REF RANGE" of 6.8 – 15.0. *Id.* at 11; *see generally Homocysteine, Total, Plasma,* Mayo Clinic Laboratories https://www.mayocliniclabs.com/test-catalog/Clinical+and+Interpretive/80379 (last visited June 11, 2021) ("Currently, the use of homocysteine for assessment of cardiovascular risk is uncertain and controversial. Based on several meta-analyses, at present, homocysteine may be regarded as a weak risk factor for coronary heart disease, and there is a lack of direct causal relationship between hyperhomocysteinemia and cardiovascular disease. It is most likely an indicator of poor lifestyle and diet."). But again, the situation does not appear to be particularly serious. Lechuga's medical records show that he has only a "mild" elevation. *Id.* at 2; *see also id.* at 8 ("CARDIAC: Regular rate and rhythm, no murmur.").

Lechuga also points to the fact that he suffers from gastroesophageal reflux. *See* Mtn., at 2 (Dckt. No. 1980). He receives medication for that condition, and according to the medical records, he is "[d]oing well." *See* BOP Medical Records (Dckt. No. 1982-1, at 8 of 12). "Symptoms controlled." *Id.* But he cites one study for the notion that reflux medication may increase the risk of contracting COVID-19 (apparently, a gastric pH of less than 3 destroys the virus, but the reflux medication lessens the acid and thus increases the pH in the stomach, making it less inhospitable). *See* Mtn., at 15. The amount of the increased risk is unknown. So, for purposes of this motion, the Court accepts the notion that reflux medication increases by some indeterminate amount the risk of contracting COVID-19.

His age does add something to the mix. As a 51-year-old man, Lechuga has some increased risk from the virus because the risk for severe illness with COVID-19 increases with

age.  *See Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/ coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited June 11, 2021). But Lechuga is again on the low end of the 50–64 age category.  And, the CDC notes that the "greatest risk for severe illness from COVID-19 is among those aged 85 or older."  *Id.*

Lechuga argues that he is a "sitting duck" because COVID-19 is raging through BOP facilities, including at his place of incarceration (FCI Oxford).  *See* Mtn., at 12 (Dckt. No. 1980). But since Lechuga filed his motion, the situation has markedly improved.  His personal characteristics do place him at some greater risk from the virus.  But as things stand, he is not in a particularly dangerous facility, either.

Currently there are 878 inmates at FCI Oxford.  *See FCI Oxford*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/oxf/ (last visited June 11, 2021).  Based on most recent information from the BOP, there are zero confirmed active cases among inmates – and zero active cases among staff – at Lechuga's facility.  *See* COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 11, 2021).  During the pandemic, a total of 642 inmates got the virus, and 642 recovered.  *Id.*

Vaccinations are well underway, too, providing another layer of protection.  Based on the most recent data about FCI Oxford, 450 inmates have received the vaccine, and 70 staff members have received it, too.  *Id.*  So 450 of the 878 inmates – more than half – have received vaccinations.  The Court does not know if Lechuga is vaccinated.

The Court also considers the information presented in Lechuga's Reply Brief and Supplement regarding his positive COVID-19 Diagnosis.  *See* Dckt. Nos. 1992, 2009.  In his reply brief, Lechuga revealed that he had contracted the virus.  *See* Reply in Support of Mtn, at 1 (Dckt. No. 1992).  Lechuga's supplement explained that he was recovering from the virus, but it

16

stressed that reinfection (and severe reinfection) was still possible. *See* Supplement, at 2–4 (Dckt. No. 2009). For its part, the government noted Lechuga's positive diagnosis in its response brief but suggested that Lechuga was asymptomatic at that time. *See* Gov't Resp., at 13 (Dckt. No. 1987). The government argued that Lechuga's diagnosis weighed against immediate release (because he could infect others if he left the facility), but it made no argument about what might happen if Lechuga becomes infected a second time. *Id*.

The Court is mindful of the Seventh Circuit's recent admonition that "[c]ommon sense can mislead; lay intuitions about medical phenomena are often wrong." *See Newton*, 996 F.3d at 490 (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). The Seventh Circuit made that observation after a district court made an assumption about a hypothetical second infection, based on how an inmate fared during a first infection. The district court "drew medical conclusions about the ramifications of a future infection without any supporting medical evidence in the record." *Id.*

This Court does not know if a modest infection the first time means that there will be a modest infection the second time, too. The parties have not put anything into the record on how a prior, mild infection affects the probability that a second infection will be mild, too. So the Court does not reach that issue. The Court does not assume that Lechuga could not be reinfected with COVID-19 or that a second infection would be as mild as the first one. When considering the motion, the Court does not hold it against Lechuga that he already got the virus and recovered.

Indeed, medical evidence submitted in Lechuga's supplemental filing establishes that reinfection is possible. *See* Supplement, at 2–4 (Dckt. No. 2009). The Court has considered this

17

information and Lechuga's diagnosis as part of its review of his medical evidence. Reinfection is possible, but the severity of a second infection is unknown.

Above and beyond health considerations, other factors do tilt the scales in Lechuga's favor. A decade and a half is a long time to be in federal prison, and by all appearances, Lechuga has made the most of it. He has taken advantage of opportunities to improve himself, taking many educational and vocational courses. *See generally* BOP Records (Dckt. No. 1982-3). His release plan looks promising. *See* Social History & Release Plan (Dckt. No. 1982-2). He has a supportive family, who have offered him a place to live once he is released. *Id.* at 2–3. He also has a full-time job waiting for him at an auto shop. *Id.* at 3. These factors (and his age) also suggest that he is less likely to reoffend once released. *See, e.g.,* United States Sentencing Commission*, Recidivism Among Federal Offenders: A Comprehensive Overview* 23, Fig. 11 (2016) (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf).

In the grand scheme of things, Lechuga does not have much time left on his sentence. He received a 20-year sentence, and after taking credits into account, he is set to be released in October 2022. So he has already paid most of his debt to society.

### B.      Factors Against Compassionate Release

On the other side of the ledger, the Court must take into account the sentencing factors in section 3553(a). Several factors weigh heavily against Lechuga's request for compassionate release. In particular, the seriousness of the offense, the nature of the crimes, the need to promote respect for the law, and Lechuga's history and characteristics stack in favor of continued incarceration.

18

Consider, for starters, Lechuga's backstory. In his early 20s, he pled guilty to unlawful delivery of a controlled substance, and unlawful use of a weapon – a "sawed off" shotgun – and received a five-year sentence. *See* Corrected Presentence Investigation Report, at 22–23 (Dckt. No. 1805). He pled guilty to domestic battery in 2001. *Id.* at 24. He was arrested for domestic battery two other times. *Id.* at 25–26.

At some point, Lechuga joined a street gang. By 2002, Lechuga was an elder statesman. He was a Senior – the highest rank – of the Insane Deuces. He was a "life-long member of the Insane Deuces, having worked himself up through the ranks of the gang, from Shorty to Junior to Senior." *See* Government's Version of the Offense, at 10 (attached to the Corrected Presentence Investigation Report) (Dckt. No. 1805).

The euphemism "worked himself up" is perhaps the wrong turn of phrase. He climbed the ladder by "engaging in the gang's core business of committing 'missions' against rival gang members and selling drugs." *Id.* at 113; *see also id.* at 10 (explaining that "missions" took place "where gang members would go out to shoot at and kill rival gang members"). To be clear, there is nothing in the record that Lechuga personally committed any violent acts as a member of the gang. Even so, whatever Lechuga did to "work himself up" in the gang, it wasn't a positive contribution to his community.

Lechuga's commitment to the gang was not a one-time, limited affair. He was a member of the gang for more than two decades. *See id.* at 113 (stating that Lechuga was a member of the Insane Deuces for "20+ years"). He has spent the better part of his life devoted to a criminal organization.

Lechuga points out that, according to one witness at trial, Lechuga had "retired" from the gang. *See* Mtn., at 6–7 (Dckt. No. 1980). Being a retired member of a criminal enterprise isn't

19

exactly a résumé-builder. The Court must consider the entire history and characteristics of the defendant, among other factors. *See* 18 U.S.C. § 3553(a). Here, the Court sees someone with a decades-long history of involvement in a criminal enterprise with violent tendencies.

He also didn't stay retired. When the gang turned to him for help waging war on a rival gang, he answered the call. "In July 2002 the war between the Insane Deuces and the Latin Kings had heated up to such an extent that the gang found it necessary to call back some of the most trusted and experienced members – men who had become Seniors, but who now, because of the need for them to take a more active role, were rolled back to Junior status. Three of the defendants in this case . . . [including] LECHUGA were part of the group of Seniors who were rolled back to Junior in order to better wage war with the Latin Kings." *See* Government's Version of the Offense, at 10 (Dckt. No. 1805).

Lechuga "advised the gang on how to better commit their planned violence against rival gang members." *Id.* at 113. For example, he "offered additional guidance" about "how to best kill an Ambrose gang leader." *Id.* at 114. Lechuga "provid[ed] guidance on how to use juvenile gang members to kill rival gang members." *Id.* In the next few months, a "torrent of violence" followed, with the gang committing "3 murders and 7 attempted murders." *Id.* at 114–15. He offered advice about "how to make the gang's drug distribution more efficient," too. *Id.* at 114.

In sum, Lechuga played an active role in a street gang that inflicted violence and wreaked havoc in the Chicagoland area. He was a member of a conspiracy that was responsible for murder, assault, illegal firearm possession, and narcotics distribution. *See Morales*, 655 F.3d at 615. As Judge Leinenweber aptly put it, Lechuga was a "member for a long period of time of a very evil organization called the Insane Deuces," and he committed "very, very serious and horrible crimes." *See* 9/3/09 Tr., at 93:8-14 (Dckt. No. 1775).

In light of that evidence, the sentencing factors in section 3553(a) weigh heavily against early release. Lechuga's crimes were particularly serious, and the interests of justice required a significant sentence. *See* 18 U.S.C. § 3553(a)(2)(A). The nature and circumstances of the offense demonstrate that a 20-year sentence was well-deserved. *See* 18 U.S.C. § 3553(a)(1). The criminality was not a one-time lapse in judgment by Lechuga, but rather was consistent with his history and characteristics. *Id.* It was merely the latest chapter in a long-running devotion to a criminal enterprise. Requiring Lechuga to serve his full time will promote respect for the law, too.

Based on the evidence at trial, the sentence imposed against Lechuga was hardly "excessive." *See* Mtn., at 4, 23–24 (Dckt. No. 1980). His role in the conspiracy was not "very limited," either. *Id.* at 5. When the gang member needed help waging war against a rival, they turned to Lechuga, drawing upon his decades of experience. And Lechuga willingly offered a helping hand.

True, Lechuga played a lesser role than some of his fellow co-defendants in the Insane Deuces gang during 2002. But Judge Leinenweber took that fact into account at sentencing, and he did so with an in-depth understanding of the entire factual record. After hearing the evidence during an eight-week trial, Judge Leinenweber imposed a sentence of 20 years' imprisonment. *See* Judgment (Dckt. No. 1679); 9/3/09 Tr., at 95:19-21 (Dckt. No. 1775). That's a significant sentence, but it was lighter than the sentence imposed against many of his co-conspirators. They have decades to go.

Lechuga argues that there was no evidence at trial that he had committed "acts of violence." *See* Mtn., at 28. Lechuga may not have pulled any triggers, but from a legal perspective, it made no difference. As a member of a conspiracy (as the jury found), Lechuga

21

was on the hook for the actions of his co-conspirators. *See Morales*, 655 F.3d at 642 ("We conclude that the district court did not clearly err in finding that his co-conspirators' violent acts were relevant to Lechuga's racketeering offense, given his long-standing Insane Deuce affiliation, his pervasive familiarity with their objectives and methods, and his renewed involvement in planning their activities.").

Lechuga believes that 20 years is too long because the government made a "mid-trial plea offer" of only 15 years. *See* Mtn., at 7, 28–29 (Dckt. No. 1980). But the government made that offer – a reduced sentence, in exchange for certainty of guilt – and Lechuga turned it down. He rolled the dice, and lost. Lechuga made the *ex ante* decision that a risk of a guilty verdict with an uncertain sentence was a better bet than a plea of guilt with a 15-year sentence. Nothing about that wager makes an eventual 20-year sentence unreasonable.

In sum, Lechuga spent "20+ years as an Insane Deuces gang member." *See* Government's Version of the Offense, at 115 (Dckt. No. 1805). He received a sentence of 20 year in prison, even though the Guidelines recommended 50 years. In the end, with good time credits, he will spend less time in federal prison than he spent in the gang. He spent more than two decades with the Insane Deuces, and will spend less than two decades with the Bureau of Prisons. That's long, but on this record, it's not too long.

## Conclusion

For the foregoing reasons, the Court hereby denies the motion for compassionate release. After considering the complete record, and after considering the section 3553(a) factors, the Court declines to exercise its discretion and reduce Lechuga's sentence. *See* 18 U.S.C. § 3582(c)(1)(A).

Date:   June 14, 2021

Steven C. Seeger
United States District Judge